Bradbury, J.
The only question which this opinion will consider relates to the liability of James H. McLain upon his subscription to the capital stock of the Tippecanoe Stone Co. The court of common ;pleas held him liable and its holding was sustained by the circuit court. This holding rests upon a finding of fact made by a referee to whom the cause was, by order of the court of common pleas referred, with directions to hear the evidence and report his findings of fact made thereon, separate from his conclusions of law. A brief reference to so much of this finding as relates to the question now under consideration will be made.
McLain, William Thornburg and Oscar Townsend, in the year 1887, owned and were operating, as partners, a certain stone quarry, stone saw mills, etc., at Tippecanoe, Harrison county, in this *73 state; McLain owning one-half, the two other partners each one-fourth. The fair value of partnership property was $37,500. The partners entered into an agreement among themselves to capitalize this property at an estimated value of $75,000, organizea corporation with a capital stock of $75,000, transfer the property to it at this estimated value, and in payment of the. property issue to themselves paid up corporate stock to an amount equal to this estimated value. Accordingly steps were taken to accomplish this end, which resulted in the incorporation of the Tippecanoe Stone Company, under the laws of this state with a capital of $75,000. At once, upon the completion of its organization, the partnership property was transferred to the corporation at the price previously fixed, and in exchange therefor, the entire stock of the corporation was issued to the partners,.or their assignees, as fully paid up. The business was conducted by the corporation for about two and one-half years, when it became insolvent and by force of an assignment under the in solvent laws, passed into the hands of Thomas A. Latto as trustee for the benefit of creditors, who now seek to recover of James H. McLain, as unpaid subscription upon the stock issued to the latter, the difference between the par value of that stock, and the value of the property transferred by him for its payment.
The capital stock of the corporation was $75,000, which being divided into shares of $100 each, aggregated seven hundred and fifty shares. McLain, as he owned a moiety of the partnership property, was, under the agreement to capitalize it as before mentioned, entitled to receive one moiety of the corporate stock, or three hundred and seventy- *74 five shares; he, however, assigned the right to receive one hundred of these shares to another, so that in the division of the shares only two hundred and seventy-five of the par value of $27,-500, fell to him. The value of the partnership property being only $37,500, just one-half the sum at which it was capitalized, it follows that McLain, in payment for two hundred and seventy-five shares of stock of the par value of $27,500, transferred to the corporation property having only one-half that value, or of the actual value of $13,750 only. This entire transaction was found to have been conceived and conducted in good faith, that is without any purpose to defraud those who, by dealing with the corporation, might subsequently become its creditors, or any one else.
The Constitution of 1851, and the statutes passed since its adoption, evince great solicitude for corporate creditors. Their security has become, in a certain sense, a part of the public policy of the state. The subject was regarded sufficiently important by the convention that framed our present Constitution to merit special attention; accordingly section 3 of article 13 of that Constitution, provides that “dues from corporations shall be secured by such individual liability of the stockholders, and other means as may be prescribed by law; but in all cases, each stockholder shall be liable, over and above the stock by him or her owned, and any amount unpaid thereon, to a further sum, at least equal in amount to such stock.” Subscriptions to the stock of a corporation are prima facie payable in money. Neither the constitutional provision on the subject of corporate dues, nor the statutes of the state contemplate any other mode for their payment. Notwithstanding *75 all this however, we do not wish to be understood to deny to corporations, created under the laws of this state, the power to exchange their stock for specific property. Many cases may be conceived where such an exchange would be for the benefit of the corporation; or even if not ultimately advantageous to the corporation yet being made between the corporation and one who dealt with it at arms length and in good faith should be deemed binding upon both parties.
The question has received the attention of many able courts, and decisions, respecting the circumstances under which a corporation may receive something else than money in payment of subscriptions to its stock have not been harmonious. In quite an early day this court held that “an agreement attempting to secure any stockholder the privilege of paying up subscriptions in store goods or otherwise, except in money, will be treated as a fraud upon other stockholders,, and payment in money enforced.” Henry et al. v. The V. & A. R. R. Co. et al., 17 Ohio, 187. If such an arrangement is a fraud upon other stockholders, it would seem to be equally so as to corporate creditors. In Noble, Admr., v. Callender et al., 20 Ohio St., 199, it was held: “A subscriber for shares of stock in a railroad company which is.not authorized by the law to receive land in payment for its stock cannot in an action against the stockholders of the company, by its creditors, set up or avail himself of the benefit of a collateral agreement between himself and the company, to the effect that the amount of his subscription was to be paid in land.” * * *
In this case the contract to pay the subscription in land was eon temporaneous with the subscrip *76 tion, and the subscription would not have been made, had it not been payable in this way, and yet it was not allowed to prevail.
The eases under consideration present an aspect much more favorable to creditors than either of the two cases above noticed, possessed. It is only by a fiction of law that it can be claimed that any contract whatever was made between the corporation and McLain respecting this exchange of its stock for his interest in the partnership property. The finding of fact shows that he subscribed for two hundred and seventy-five shares of the capital stock of apar value of $27,500. The obligation imposed upon him by this subscription was to pay for it in money at its par value. ■ There were but five stockholders of which he was one, he must have been a director of the corporation and the finding shows he was at the time its president. On the same day that he made his subscriptions, and it would seem contemporaneously with it, the entire number of shares he had subscribed was issued to him as fully paid up, the sole considera* tion being the transfer to the corporation of the partnership property. No negotiations of any kind appear to have been had between him and the corporation. Whatever contract was made between them resulted not from any negotiations, but from their acts. On the same day, and the inference is, at the same time, he subscribed for the stock, transferred his interest in the partnership property to the corporation, and in exchange therefor received fully paid up shares of stock to the number he had subscribed, the par value of which was just double the property he transferred to it. Doubtless the inference to be drawn from this transaction is that the corporation agreed to accept *77 his interest in the partnership property in full payment of the shares of its stock he had subscribed and it is equally inferable from this transaction that he would not have subscribed for these shares had the subscription not been so payable. However the utmost formality would have added no sanction to such an agreement. The directors might have formally voted to buy this property at the estimated price and to issue paid up shares of its stock in payment, and entered upon their minutes a resolution to that effect. Nevertheless the courts would sweep aside these formal acts and view the transaction as it actually occurred, when it would have appeared that it was the result, not of any actual negotiations between him and representatives of the corporation but of a previous contract made by the three partners among themselves, by which the partnership property was to be estimated at double its actual value, a corporation formed, and this property transferred to it at this inflated value, and fully paid up shares of stock issued to the partners, or as they might direct, in the proportion that they were interested in the partnership property.
Although this may all have been done in the utmost good faith, and without an evil intention towards those who, by subsequently dealing with the corporation, might become corporate creditors, nevertheless the fact remains that these corpora-tors held out to the world that the concern they had created, and represented had a fully paid up capital of $75,000, whereas, in fact, its captial was one-half that sum only. They might have honestly belived that a career of prosperity lay before the enterprise which they had thus launched upon the commercial world; yet they cast upon others a *78 considerable share of the risks that might attend it. Notwithstanding the frequency with which corporations are created with fictitious capital, persons who have occasion to deal with those organized under the laws of this stateand doing business within its borders, are not bound to anticipate this condition of its affairs, but may assume that it is what it purports to be.
This attempt by McLain and his associates to dispose of their property at a fictitious or inflated value, to a corporation of their own creation, — one designed, and brought into existence, chiefly for that purpose — should be regarded as a fraud upon the subsequent creditors of the concern, although no evil intent accompanied the transaction and the difference between the actual and the inflated value of the property so conveyed should be deemed unpaid subscription upon the stock issued in this way, whenever necessary to protect the rights of the corporate creditors. What might be the rights of a creditor who, with full knowledge of the acts of these corporators, and of the inflated value of the property transferred to the corporation, choose to extend credit to the concern we need not inquire, for that question is -not raised in the record.
• Judgment affirmed.